UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____

STATE FARM MUTUAL
AUTOMOBILE INSURANCE
COMPANY and STATE FARM FIRE
AND CASUALTY COMPANY,

Plaintiffs,

vs.

ADVANCE MEDICAL ASSOCIATES
AND FORME REHAB, INC.;
HOLLYWOOD WELLNESS AND
REHABILITATION CENTER, INC.;
MEDWELL WELLNESS AND
REHABILITATION CENTER, INC.;
ACCUMED WELLNESS AND
REHABILITATION CENTER, INC. d/b/a
TOTAL REHAB AND WELLNESS;
TOTAL REHABILITATION &
WELLNESS CENTER, P.A. d/b/a VDG
and d/b/a CONFIDENT WELLNESS;
LINDA D. VARISCO, D.C.; OLGA
SPIVAK, D.C.; DAVID GREYDINGER,
D.C.; FELIX FILENGER; and ANDREW
RUBINSHTEYN,

Defendants.

_____/

## **COMPLAINT**

Plaintiffs, State Farm Mutual Automobile Insurance Company ("State Farm Mutual") and

State Farm Fire and Casualty Company ("State Farm Fire") (collectively "Plaintiffs"), sue

Advance Medical Associates and Forme Rehab, Inc. ("Advance"), Hollywood Wellness and

Rehabilitation Center, Inc. ("Hollywood"), Medwell Wellness and Rehabilitation Center, Inc.

("Medwell"), Accumed Wellness and Rehabilitation Center, Inc. d/b/a Total Rehab and Wellness ("Accumed"), Total Rehabilitation & Wellness Center, P.A. d/b/a VDG and d/b/a/ Confident Wellness ("Total"), Linda D. Varisco, D.C. ("Varisco, D.C."), Olga Spivak, D.C. ("Spivak, D.C."), David Greydinger, D.C. ("Greydinger, D.C."), Felix Filenger ("Filenger") and Andrew Rubinshteyn ("Rubinshteyn"), hereinafter collectively referred to as ("Defendants"), and allege:

## Nature of the Case

1.      The case arises out of Advance, Hollywood, Medwell, Accumed and Total (collectively "Defendant clinics") unlawfully providing health care services to individuals eligible for Personal Injury Protection ("PIP") benefits.

2.      Felix Filenger ("Filenger") and/or Andrew Rubinshteyn ("Rubinshteyn") maintained an ownership interest, in whole or in part, in all the Defendant clinics. Filenger is a lay person that has never held a medical license of any kind in the State of Florida. Rubinshteyn is licensed in the State of Florida as an occupational therapist.  Ownership of Defendant clinics, in whole or in part, by Filenger and/or Rubinshteyn requires the Defendant clinics to be licensed pursuant to the Health Care Clinic Act (HCCA). Nonetheless, Defendant clinics were not licensed pursuant to the HCCA.

3.      Defendants concealed Filenger's and/or Rubinshteyn's ownership interest by representing to the State of Florida that Varisco, D.C., Spivak, D.C. and Greydinger, D.C. (collectively "Defendant chiropractic physicians") wholly owned Defendant clinics. This "wholly owned" exemption allowed Defendant clinics to operate without a license under the HCCA.

4.      If the HCCA applies to a clinic (i.e. the clinic is not exempt under the "wholly owned" exemption) and it is not properly licensed, the clinics' services are unlawful and noncompensable under Florida law.

5.      The Defendants orchestrated a scheme to unlawfully provide medical services to patients insured by State Farm Mutual and State Farm Fire involved in automobile accidents and to bill State Farm Mutual and State Farm Fire for those services.

6.      Defendants submitted bills for PIP benefits to State Farm Mutual and State Farm Fire, for which payments were made under the mistaken belief (induced by Defendants) that the Defendant clinics were lawfully operating.

7.      Defendants obtained payment from State Farm Mutual and State Farm Fire for services that were not lawfully provided because: (a) Defendant clinics were not licensed as required by Florida law; (b) Defendant clinics did not qualify for the "wholly owned" exemption from Florida's mandatory clinic licensure laws because Filenger and/or Rubinshteyn were the true owner, in whole or in part, and/or controlled the operations of Defendant clinics; and (c) Defendants participated in a scheme to intentionally circumvent Florida's mandatory clinic licensing laws.

8.      Plaintiffs seek to recover the amounts paid to Defendants based upon unjust enrichment and seek a declaratory judgment confirming that State Farm Mutual and State Farm Fire are not obligated to pay any of Defendants' demands, bills, or invoices, to the extent they remain unpaid, because the services were not "lawfully provided," which is a condition to seeking or obtaining PIP benefits under Florida law. *See* §627.736(1)(a) and (5)(b)1.b., Fla. Stat.

**Jurisdiction and Venue**

9.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332 and §1367(a) based upon the diverse citizenship of the parties and the amount in controversy, which exceeds $75,000.00, exclusive of interest and costs.

10.      Venue is proper in this Court pursuant to 28 U.S.C. §1391 because a substantial part of the events giving rise to Plaintiffs' claims occurred in this judicial district, Defendants reside and/or do business in this judicial district, and the conduct of the Defendants has resulted in actionable conduct in this judicial district.

**Plaintiffs**

11.      Plaintiff State Farm Mutual is an Illinois domestic property and casualty insurer incorporated under the laws of Illinois, with its principal place of business in Bloomington, Illinois. State Farm Mutual is registered to conduct business in the State of Florida as a foreign corporation and is doing business in Palm Beach, Broward and Miami-Dade County, Florida.

12.      Plaintiff State Farm Fire is an Illinois domestic property and casualty insurer incorporated under the laws of Illinois, with its principal place of business in Bloomington, Illinois. State Farm Fire is registered to conduct business in the State of Florida as a foreign corporation and is doing business in Palm Beach, Broward and Miami-Dade County, Florida.

13.      Plaintiffs are licensed and authorized to offer and issue and did offer and issue automobile insurance policies in Florida providing PIP and/or medical payments coverage (MPC) pursuant to Florida's Motor Vehicle No-Fault Law ("No-Fault Law") under which Defendants seek payment.

14.      Pursuant to Assignments of Benefits accepted from State Farm Mutual and State Farm Fire Insureds, allegedly entitling Defendant clinics to receive payment directly from State

Farm Mutual and State Farm Fire for expenses for medical services rendered to the Insureds, Plaintiffs made substantial insurance payments in excess of $1.8 million to, or for the benefit of, Defendants under the belief that the services provided by Defendants were "lawfully provided" as required by Florida law.

## Defendants

15.    Defendants Felix Filenger ("Filenger") and Andrew Rubinshteyn ("Rubinshteyn") reside in Miami Dade County, Florida. While at all times material to this action, Defendant clinics purported to be separate and independent Florida for profit corporations competing in the South Florida PIP market as health care clinics owned by Defendant chiropractic physicians, it was actually Filenger and/or Rubinshteyn who were the true owners, in whole or in part, of Defendant clinics and who played a key role in formulating and orchestrating the scheme to bill Plaintiffs for services that were not lawfully rendered.

### Varisco Clinics

16.    Defendant Linda D. Varisco, D.C. ("Varisco, D.C.") is a licensed Florida chiropractic physician and resident of Broward County, Florida.  At times material, Varisco, D.C. falsely purported to wholly own Advance and Hollywood, two Florida for profit corporations operating as health care clinics in Broward County, Florida.

17.    At times material, Defendant Advance Medical Associates and Forme Rehab, Inc. ("Advance"), is a Florida corporation with its principal place of business located at 7000 W. Oakland Park Blvd., Suite 202, Sunrise, Florida 33313. Since 2008, Varisco, D.C. is the sole President and Vice President of Advance. Since 2012, Varisco, D.C. also is Advance's Registered Agent. Advance operated as an unlawful health care clinic purportedly providing

medical services to State Farm Mutual and State Farm Fire Insureds involved in automobile accidents from approximately 2010 to present.

18.     Hollywood Wellness and Rehabilitation Center, Inc. ("Hollywood"), at times material, is a Florida corporation with its principal place of business located at 6030 Hollywood Blvd., 250A, Hollywood, Florida 33024. Hollywood was incorporated in April 2014 by Varisco, D.C., who is its sole President and Registered Agent. Hollywood operated as an unlawful health care clinic purportedly providing medical services to State Farm Mutual and State Farm Fire Insureds from inception until its dissolution in September 2016.

Spivak Clinics

19.     Defendant Olga Spivak, D.C. ("Spivak, D.C.") is a licensed Florida chiropractic physician and resident of Broward County, Florida. At times material, Spivak, D.C. falsely purported to wholly own Medwell and Accumed, two Florida for profit corporations operating as health care clinics in Palm Beach County and Miami-Dade County, Florida, respectively.

20.     At times material, Defendant Medwell Wellness and Rehabilitation Center, Inc. ("Medwell") is a Florida corporation that purportedly provided medical services to State Farm Mutual and State Farm Fire Insureds involved in automobile accidents at its principal place of business located at 2250 Palm Beach Lakes Blvd., 106, Palm Beach, Florida 33409. Although Medwell was purportedly incorporated by Spivak, D.C. in May 2013, the true owner of Medwell was Filenger and/or Rubinshteyn. Accordingly, Medwell operated as an unlawful health care clinic from its inception until its dissolution in September 2016.

21.     Defendant Accumed Wellness and Rehabilitation Center, Inc. d/b/a Total Rehab and Wellness ("Accumed") is a Florida corporation incorporated in May 2013. Although Spivak, D.C. purports to be the sole President and Registered Agent of Accumed, its true owner was

Filenger and/or Rubinshteyn. Accumed purportedly provides medical services to State Farm Mutual and State Farm Fire Insureds involved in automobile accidents at its principal place of business located at 290 NW 165th Street, Suite P250, Miami, Florida 33169 – at times material, the exact same location of Total. Accordingly, Accumed operated as an unlawful health care clinic from its inception to present.

Greydinger Clinics

22.     Defendant David Greydinger, D.C. ("Greydinger, D.C.") is a resident of Lee County, Florida. Greydinger, D.C. was the incorporator of Total and purportedly its sole owner from inception in November 2009 until his chiropractic license was permanently revoked in September 2014, following a plea of guilty to one count of Preparing and Presenting False and Fraudulent Insurance Claims of less than $20,000.00, with one notable exception.

23.     During the pendency of criminal proceedings against Greydinger, D.C. in 2013, Spivak, D.C. purportedly acquired Total and was later listed as its sole President and Registered Agent from April 2014 to August 2014. During that same timeframe, Spivak, D.C. also purportedly owned Accumed, a competing chiropractic clinic that shared the same business address as Total and registered the fictitious name "Total Rehab and Wellness." According to an amended annual report filed on August 26, 2014, Greydinger, D.C. again assumed the role of President and Registered Agent of Total; although on paper Total and Accumed are two separate and distinct entities, upon information and belief, Accumed/Spivak, D.C. acquired Total.

24.     Defendant Total Rehabilitation & Wellness Center, P.A. d/b/a VDG and d/b/a Confident Wellness ("Total") is a Florida corporation purportedly providing medical services to State Farm Mutual and State Farm Fire Insureds at its principal place of business located at 290 NW 165th Street, Suite P250, Miami, Florida 33169. This is the same address as Accumed,

allegedly owned by Spivak, D.C.   As further detailed below, Total operated as an unlawful health care clinic from its inception in 2009 to present.

## Facts Common to All Counts

## The Health Care Clinic Act ("HCCA"), §§400.990 et seq., Fla. Stat

25.     In 2003, the Florida Legislature enacted the HCCA to "provide for the licensure, establishment, and enforcement of basic standards for health care clinics and to provide administrative oversight by the Agency for Health Care Administration" requiring health care clinics to obtain a license from the Agency for Health Care Administration (AHCA) because "regulation of health care clinics must be strengthened to prevent significant cost and harm to consumers." *See* §400.991 and §400.990, Fla. Stats.

26.     The HCCA outlines the mandatory licensing requirements for health care clinics to operate in the State of Florida. Under the HCCA, a Florida health care clinic can avoid obtaining a license from AHCA if it is "wholly owned" by one or more licensed health care practitioners, which can include one or more chiropractic physicians, so long as one of the owners who is a licensed health care practitioner is supervising the business activities and is legally responsible for the entity's compliance with all federal and state laws ("wholly owned" exemption). *See* §400.991, §400.9905(4)(g) and §627.736, Fla. Stats.

27.     The HCCA defines "clinic" and therefore, which entities are required to maintain licensure as "an entity where health care services are provided to individuals and which tenders charges for reimbursement for such services, including a mobile clinic and a portable equipment provider." *See* §400.9905(4), Fla. Stat.

28.    In addition, the HCCA provides various exemptions to the definition and licensing requirement of a "clinic." *See* §400.9905(4)(a)-(n), Fla. Stat. (for each possible exemption)

29.    In particular, §400.9905(4) and (4)(g), Fla. Stat., provide that the term "clinic" does not include and the licensure requirements do not apply to:

> (g) A sole proprietorship, group practice, partnership, or corporation that provides health care services by licensed health care practitioners under … chapter 480 … and that is <u>wholly owned</u> by one or more licensed health care practitioners, or the licensed health care practitioners set forth in this paragraph and the spouse, parent, child or sibling of a licensed health care practitioner if one of the owners who is a licensed health care practitioner is supervising business activities and is legally responsible for the entity's compliance with all federal and state laws.

30.    Although "wholly owned" by the licensed health care practitioner is not defined by the HCCA, several factors are commonly tied to ownership; the medical professional must demonstrate actual ownership of the medical clinic through the following factors:

a.    Ownership of the stock of a corporation and the exercise of corporate powers;

b.    the extent of any capital investment in the business;

c.    the right to profit from the business and the risk of loss;

d.    the power to sell the business or cause it to cease operations; and

e.    the extent to which an individual participates in the management and control of the business operations.

*State Farm v. Silver Star Health and Rehab Inc.*, 739 F. 3d 579 (11th Cir. 2013).

31.    Further, §400.9935(3), Fla. Stat. provides that "All charges or reimbursement claims made by or on behalf of a clinic that is required to be licensed under this part, but that is not so licensed … are unlawful charges, and therefore are noncompensable and unenforceable."

**The Florida Motor Vehicle No-Fault Law §627.736, Fla. Stat.**

32.     Under the No-Fault Law, individuals who are injured in an automobile accident may seek reimbursement for medically necessary expenses (PIP claims) up to a maximum of $10,000 in benefits. Insurers are required to pay 80% of all reasonable expenses for medically necessary services.

33.     At all times material, the No-Fault Law requires services to be lawfully rendered in order to be compensable. *See* §627.736(5)(a)(1), Fla. Stat.

34.     "Lawful" or "lawfully", as defined in §627.732(11), Fla. Stat., means to be "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment."

35.     Clinics must comply with the HCCA in order to "lawfully" provide services within the meaning of §627.732(11), Fla. Stat.

36.     At all times material, the No-Fault Law does not require an insurer or insured to pay a claim or charges for any service that was not lawful at the time it was rendered. *See* §627.736(5)(b)(1)(b), Fla. Stat.

37.     Thus, services that are performed by a healthcare provider that is not appropriately licensed are not "lawfully" provided as required by the No-Fault Law.

38.     Effective January 1, 2013, the Florida Legislature amended the No-Fault Law to include a definition of "wholly owned". "Entity wholly owned" is defined by the No-Fault Law to mean:

> "a proprietorship, group practice, partnership, or corporation that provides health care services rendered by licensed health care practitioners and in which licensed health care practitioners are the business owners of all aspects of the business entity, including, but not limited to, being reflected as the business owners on the title or lease of the physical facility, filing taxes as the business owners, being account holders on the entity's bank account, being listed as the

principals on all incorporation documents required by this state, and having ultimate authority over all personnel and compensation decisions relating to the entity. However, this definition does not apply to an entity that is wholly owned, directly or indirectly, by a hospital licensed under chapter 395."

*See* §627.732(17), Fla. Stat. (2012) (effective January 1, 2013), HB 119 and Ch. 2012-197, Laws of Fla.

### The Health Care Licensing Procedures Act ("Licensing Procedures Act")
### §§ 408.801 et seq. Fla. Stat.

39.     The HCCA also incorporates the licensure requirements of the Licensing Procedures Act.   Similar to the HCCA, the Licensing Procedure Act recognizes that "[u]nlicensed activity constitutes harm that materially affects the health, safety, and welfare of clients." *See* §408.812(2), Fla. Stat.

40.     Accordingly, the Licensing Procedure Act provides strict penalties for unlicensed activity. For example, anyone who engages in unlicensed activity under Section 408.812 of the Act commits a felony of the third degree, and each day of continued operation is a separate offense. *See* §400.9935, Fla. Stat. These are among the provisions which make it clear that unlicensed activities at health care clinics are unlawful under both the HCCA and the Licensing Procedures Act.

### Florida's Chiropractic Medicine Laws, Chapter 460, Fla. Stat.

41.     The Florida Legislature has enacted additional laws imposing further obligations on chiropractic physicians to ensure that "chiropractic physicians who fall below minimum competency or who otherwise present a danger to the public health [are] prohibited from practicing in this state." §460.401, Fla. Stat.

42.     Consistent with that purpose, §460.4167, Fla. Stat. prohibits an unlicensed person from employing or contracting with a licensed chiropractic physician to provide services authorized under that chapter unless the unlicensed person is the spouse, parent, child, or sibling

11

of the chiropractic physician or the employer is an entity wholly owned by a licensed chiropractic physician.   It also expressly prohibits chiropractic physicians from entering into arrangements pursuant to which an "unlicensed person or [unlicensed] entity exercises control" over any of the following:

(a) the selection of a course of treatment for a patient, the procedures or materials to be used as part of such course of treatment, and the manner in which such course of treatment is carried out by the licensee;

(b) the patient records of a chiropractor;

(c) policies and decisions relating to pricing, credit, refunds, warranties, and advertising; or

(d) decisions relating to office personnel and hours of practice.

*See* §460.4167(4), Fla. Stat.

43.   Similar to the HCCA and the Licensing Procedures Act, the stated legislative purpose of these requirements is "to prevent a person other than a licensed chiropractic physician from influencing or otherwise interfering with the exercise of a chiropractic physician's independent professional judgment." *Id.*

44.   In sum, the HCCA, the No Fault Law, the Licensing Procedures Act, and Chiropractic Medicine Laws embody Florida's strong public policy against lay people exercising ownership and/or control over health care clinics, including chiropractic clinics.

### The Defendant's Scheme to Defraud

45.   Filenger owned and operated Interpublic Medical Specialists, Co., Inc. ("Interpublic"), which purportedly provided billing services to the Defendant clinics. In fact, Filenger and Rubinshteyn designed and implemented a scheme to conceal their true ownership and control of Defendant clinics.

46.   Filenger and Rubinshteyn offered up Defendant chiropractic physicians as "straw" or "paper" owners of their clinics to unlawfully secure licensure exemptions and benefit

from the lucrative nature of the PIP business while avoiding the mandatory licensing and stringent oversight by AHCA.

47.     To aid this scheme, Defendant chiropractic physicians misrepresented they were the 100% owners of the Defendant clinics so the Defendant clinics could claim to qualify under the "wholly owned" exemption from AHCA licensing requirements.

48.     The Defendant clinics then submitted charges to Plaintiffs for medical services allegedly provided to State Farm Mutual and State Farm Fire Insureds, contending that their medical services were lawful and payable.

49.     Since January 1, 2010, Defendant clinics have collectively billed over $5 million and Plaintiffs have paid Defendant clinics in excess of $1.8 million. *See* Exhibit "A" attached hereto.

<u>**Facts Evidencing the Scheme**</u>

### I.     Accumed and Total

50.     Accumed, allegedly solely owned by Spivak, D.C., is not licensed with AHCA because Spivak, D.C. represented that she is the sole or 100% owner of Accumed. Therefore, Accumed could claim that it qualifies under the "wholly owned" exemption from AHCA licensing requirements.

51.     Total, allegedly solely owned by Greydinger, D.C., is not licensed with AHCA because Greydinger, D.C. represented that he is the sole or 100% owner of Total. Therefore, Total could claim that it qualifies under the "wholly owned" exemption from AHCA licensing requirements.

52.     While Accumed and Total, purport to be separate and independent clinics owned by two different chiropractic physicians, Spivak, D.C. and Greydinger, D.C., Accumed was created to replace Total following and during Greydinger, D.C.'s criminal proceedings.

53.     Accumed and Total both used Filenger's medical billing company, Interpublic, as its billing provider.  Interpublic operated at the same address as Accumed and Total, 290 NW 165th Street, Suite P250, Miami, Florida 33169 ("290 address"). Upon information and belief, Interpublic operated at the 290 address from approximately May 2013 to July 2014.

54.     Filenger and Rubinshteyn exercised control over all of Accumed's and Total's business operations, starting with securing the lease for the office space both Accumed and Total shared at the 290 address.

55.     The Office Lease Agreement ("lease") for the office space at the 290 address, which Total (later Accumed) and Interpublic shared is dated March 3, 2010 and identifies the Landlord as Alden Property Corporation and the Tenant as Best Choice Wellness and Rehab, P.A. ("Best Choice"). Rubinshteyn signed the lease as President of Best Choice and to secure the office space, issued and signed a check for $23,174.78 payable to Alden Property Corporation from Best Choice's business account.

56.     To qualify for the lease, Filenger provided financial statements for Confident Wellness Center P.A., described by Filenger as the parent company for Best Choice, and signed a Credit Release Form.

57.     Filenger and Rubinshteyn also leased separate office space at the 290 address, suite P-500, adjacent to the clinics and described as their private office.

58.     In August 2012, a First Amendment to Lease Agreement ("Amended Lease") was entered into between Alden Property Corporation and Best Choice to extend the lease term for

the office space at the 290 address, suites P-250 and P-500, for an additional year commencing June 1, 2013 and expiring May 31, 2014. The Amended Lease is signed by Rubinshteyn and witnessed by Filenger. It was represented that Best Choice was d/b/a Total Wellness and Rehabilitation. In fact, statements show rent was billed to Total Rehabilitation and Wellness since 2011.

59.     Filenger and Rubinshteyn presented themselves as the owners of Total, and as described below, later of Accumed, paid rent, made decisions about the clinic and space, and were the only ones who could give authorization for keys.

60.     On May 13, 2013, Accumed was incorporated by Spivak, D.C.  Approximately two months later, Accumed registered the fictitious name "Total Rehab and Wellness," a mirror image of Total's original name and listed the 290 address as the business mailing address. Upon information and belief, Accumed was created for Filenger and/or Rubinshteyn by Spivak, D.C. to replace Total during Greydinger, D.C.'s criminal proceedings.

61.     In July 2013, State Farm Mutual performed a clinic inspection of Total at the 290 address.  During the clinic inspection, office manager Tina Kostanyan ("Kostanyan") advised that Accumed was the new name for Total, which had operated at the 290 address since 2010, and that the clinic had been "sold" around May 2013 to Spivak, D.C.

62.     Kostanyan denied that Greydinger, D.C. or Spivak, D.C. worked in the clinic or had any regular duties and stated that despite the change in "ownership," the equipment, the staff and the operations of the clinic remained unchanged.

63.     Upon information and belief, in July 2013, Filenger and Rubinshteyn represented that their company was changing its name to Accumed and requested new suite entry signage to read "Accumed Wellness and Rehabilitation Center."

64.     On May 31, 2014, the Amended Lease for the office space at the 290 address expired. Upon information and belief, around the time the Amended Lease was set to expire, for the first time, Filenger and Rubinshteyn represented that Spivak, D.C. was the "owner" of Accumed and that Accumed acquired Best Choice. A real estate broker, who upon information and belief was hired by Filenger and Rubinshteyn, attempted to negotiate a potential re-assignment of the lease from Best Choice/Total to Accumed. In connection with the lease re-assignment negotiations, Rubinshteyn provided financial statements from Accumed and Medwell, representing Medwell as another of Spivak, D.C.'s clinics located in West Palm Beach.

65.     In June 2014, after negotiations failed, Filenger, Rubinshteyn and Accumed vacated the office space at the 290 address.  Accumed and Interpublic moved their business operations to 16853 NE 2nd Ave., North Miami, Florida 33162, Suite 301 and 302, respectively.

66.     In August 2014, according to an Amended Annual Report filed with the Florida Division of Corporations, the "ownership" of Total allegedly reverted back to Greydinger, D.C.

## II.     Medwell

67.     Medwell, incorporated by Spivak, D.C. just days after Accumed in May 2013, is also allegedly "wholly owned" by Spivak, D.C., and like Accumed, is not licensed by AHCA. Notwithstanding Spivak, D.C.'s alleged ownership, the de facto owner of Medwell is Filenger and/or Rubinshteyn.

68.     Upon information and belief, Spivak, D.C. incorporated Medwell for Filenger and/or Rubinshteyn, and as part of the scheme, misrepresented that she was the sole owner of Medwell so that Medwell could claim to qualify under the "wholly owned" exemption from AHCA licensing requirements.

69.     In November 2013, State Farm Mutual performed a clinic inspection of Medwell (located in Palm Beach). During that inspection, Christine French, D.C. ("French, D.C."), who was the first and only chiropractic physician working at Medwell since it opened in May 2013, stated that she was interviewed and hired by Felix Filenger. French, D.C. represented that Filenger introduced himself to her as the owner of Medwell. French, D.C. referred to Spivak, D.C. as her "supervisor," but stated that Spivak, D.C. does not provide patient care or do anything at the clinic, and that billing is done in another office in Miami (Interpublic). French, D.C. stated that she has never seen any of the billing from Medwell.

### III.     Advance and Hollywood

70.     Advance and Hollywood are both purportedly owned by Varisco, D.C. In fact, the de facto owners of Advance and Hollywood, in whole or part, are Filenger and/or Rubinshteyn.

71.     Advance obtained a formal Certificate of Exemption from Licensure in 2008 based upon its sole ownership by Joseph Ferrante, D.C. (Varisco, D.C.'s deceased husband). Advance, however, has maintained its exemption because Varisco, D.C. misrepresented that she remains the sole owner of Advance since 2010.

72.     An Insured testified she received treatment at Advance, allegedly owned by Varisco, D.C. and was then "transferred … up to West Palm Beach … because it is closer to where I live." The Insured further testified that the suggestion she transfer to the West Palm Beach office was made by the receptionist "Inga" a "…lady with … blond hair"  who had a Russian accent after Inga noticed that she lived in Martin County. This physical description matches Inna Giter ("Giter"), Advance's office manager. The Insured believed that Advance and the clinic in West Palm Beach were related "because she asked me why wasn't I going to the office in Palm Beach."

73.   Varisco, D.C. does not own any clinic in West Palm Beach. In fact, the patient subsequently visited and received treatment at Medwell located in Palm Beach and allegedly owned by Spivak, D.C. Thus, the Insured was "transferred" from Advance, a clinic allegedly owned by Varisco, D.C. to Medwell, a competing clinic allegedly owned by Spivak, D.C.

74.   Another Insured testified under oath that he was told the blond woman in her forties at Advance (believed to be Giter) was the owner; this does not match the description of the purported owner, Varisco, D.C., who has dark brown hair.

75.   In addition, Varisco, D.C. provided a "Health Care Provider Certification of Eligibility for PIP Benefits" form in which she claims to be the 100% owner of Advance. This form is notarized in Miami-Dade County by Kostanyan, Accumed's/Total's office manager. Significantly, Kostanyan worked at the 290 address for Accumed/Total, which also shared office space with Filenger's company, Interpublic.

76.   Varisco, D.C. does not reside or work in Miami-Dade County. Instead, Varisco, D.C. resides and works in Broward County.  Despite the distance, Varisco, D.C., who resides and works in Broward County, utilizes the notary services of an office manager who works for a competing clinic located in Miami-Dade County.

77.   In April 2014, Varisco, D.C. incorporated Hollywood, which she alleges to also "wholly own" and is not licensed by AHCA. Upon information and belief, Varisco, D.C. incorporated Hollywood for Filenger and/or Rubinshteyn and has misrepresented to be the 100% owner of Hollywood so that Hollywood could claim to qualify under the "wholly owned" exemption from AHCA licensing requirements.

78.   In connection with a claim for PIP benefits presented by Hollywood, Varisco, D.C. provided a "Sworn Statement of Ownership" form in which she declares she is the owner,

president and sole shareholder of Hollywood. A copy of a lease for Hollywood's office space and a "Health Care Provider Certification of Eligibility for PIP Benefits" form is attached to the "Sworn Statement of Ownership". The lease for Hollywood's office space is witnessed by Giter, Advance's office manager and the "Health Care Provider Certification of Eligibility for PIP Benefits" form is notarized by Kostanyan, Accumed's/Total's office manager.

79.     Again, Varisco, D.C. does not reside or work in Miami-Dade County. Instead, Varisco, D.C. resides and works in Broward County. Despite this distance, she utilizes the notary services of an office manager who works for a competing chiropractic clinic located in Miami-Dade County.

### IV.     Filenger and Rubinshteyn Control Cross-Over of Chiropractic Owners, Treating Chiropractic Physicians and Shared Use of Outside Medical Providers

80.     Despite supposedly being competitors in the same market, Defendant chiropractic physicians work at competing Defendant clinics. In addition, these competing clinics share several treating chiropractic physicians and outside medical providers.

81.     For example, upon information and belief, Spivak, D.C. (alleged owner of Medwell and Accumed) worked at Hollywood (purportedly owned by Varisco, D.C.); Greydinger, D.C. (Total's alleged owner) purportedly performed diagnostic testing on a patient at Advance (allegedly owned by Varisco, D.C.). On information and belief, an owner of a clinic would not work for a competitor clinic, unless they are under common ownership and control.

82.     French, D.C., the (former) treating chiropractic physician at Medwell who reported that Filenger is the true owner of Medwell, later worked at another clinic suspected to be owned by Filenger and/or Rubinshteyn, in whole or in part, called Global Wellness and

Rehabilitation, Inc. ("Global") located at 601 E. Sample Rd., Suite 108, Pompano Beach, Florida 33064.

83.     Chiropractic physician Frankie Rizzuto, the alleged "owner" of Global, is reported to be a 1099 employee of Global and work part-time at Advance (a competing clinic purportedly owned by Varisco, D.C.).

84.     A treating chiropractic physician at Global reported to have been interviewed and hired by Rubinshteyn, whom was believed to be the owner of Global or work for the true owner. Upon information and belief, Giter (Advance's office manager) also worked at Global. Again, Global would be competing against Advance, purportedly owned by Varisco, D.C.

85.     The Defendant clinics all use the same outside medical providers for diagnostic services such as electromyogram ("EMG") testing, nerve conduction velocity ("NCV") testing, magnetic resonance imaging ("MRI's"), and mobile x-ray services. Upon information and belief, the use of the outside medical providers for these tests is controlled by Filenger and Rubinshteyn and not the alleged chiropractic owners.

86.     Varisco, D.C. provided deposition testimony on October 6, 2015 regarding care and treatment rendered to a patient at Advance. During the deposition, she testified that a woman came to Advance and performed an EMG. The provider was not employed by Advance and not hired by Varisco, D.C. (the purported owner of Advance). In fact, Varisco, D.C. did not know the name of the business the woman worked for. Similarly, Varisco, D.C. did not know who retained a company that performed NCV/needle EMG testing at "her" clinic (Advance) and did not have any personal contact with that company. This lack of knowledge is inconsistent with Varisco, D.C.'s alleged ownership.

**Amounts Paid by State Farm**

87.     Defendant clinics submitted charges in excess of $5 million and received payments of over $1.7 million from State Farm Mutual and over $165,000.00 from State Farm Fire. *See* Exhibit "A" attached hereto.

88.     None of the charges submitted and/or payments received for services from Defendant clinics were "lawfully" provided because the clinics were not properly licensed under the HCCA and Licensing Procedures Act, and the services were in violation of Florida law.

89.     As a result, Plaintiffs are entitled to recover all payments issued to Defendant clinics of at least $1.8 million and a declaratory judgment confirming that Plaintiffs are not obligated to pay any of the outstanding charges submitted by Defendant clinics totaling over $2.1 million. *See* Exhibit "A" attached hereto.

90.     Plaintiffs have retained the undersigned firm as its legal counsel in this matter and are obligated to pay the undersigned firm's costs and reasonable attorney's fees.

91.     All conditions precedent to the filing of this Complaint have been satisfied, excused or waived.

**COUNT I – UNJUST ENRICHMENT AS TO ALL DEFENDANTS**

92.     Plaintiffs re-affirm and re-allege each and every allegation in paragraphs 1-91 as if fully set forth herein.

93.     Plaintiffs unwittingly conferred PIP and MPC benefits on Defendants by making payments to them directly (whether personally or on behalf of others) totaling over $1.8 million for improper charges for services that were not lawfully provided.

94.     Defendants voluntarily accepted and retained these benefits from Plaintiffs, despite their knowledge that the services purportedly rendered were not "lawfully provided" as required by Florida law.

95.     Defendant's retention of these benefits was, and is, wrongful because these monies were obtained for purported health care services provided by clinics in violation of applicable Florida law.

96.     Plaintiffs have been harmed by Defendants' wrongful actions because Plaintiffs would not have paid over $1.8 million for these services if they had known at the time these claims were paid that the services were provided in violation of Florida law and, accordingly, were not reimbursable pursuant to Florida law. *See* Exhibit "A" attached hereto.

97.     It would be unjust under these circumstances to allow Defendants to continue to retain these benefits due to the misconduct described above.

WHEREFORE Plaintiffs respectfully request this Court to enter judgment in their favor and award damages, interest, and costs against all Defendants in an amount to be proven at trial, and grant such other relief as the Court deems just and appropriate.

## COUNT II – DECLARATORY JUDGMENT AS TO THE DEFENDANT CLINICS (ADVANCE, HOLLYWOOD, MEDWELL, ACCUMED AND TOTAL)

98.     Plaintiffs re-affirm and re-allege each and every allegation in paragraphs 1-91 as if fully set forth herein.

99.     There is an actual case and controversy between Plaintiffs and Defendant clinics relating to Plaintiffs' obligation to pay in excess of $2.1 million submitted by Defendant clinics which has not been paid and remains pending. *See* Exhibit "A" attached hereto.

100.    Defendant clinics have engaged in an unlawful scheme to circumvent the mandatory licensing requirements of AHCA as required by Florida law in order to conceal their true owner and deceive and mislead Plaintiffs.

101.    Defendant clinics were not properly licensed with AHCA at the time they submitted charges to Plaintiffs for payment of services, nor did they meet the requirements for an exemption from AHCA licensure because they were not "wholly owned" by a licensed healthcare practitioner who supervised the business activities of the clinics and was legally responsible for each clinic's compliance with all federal and state laws.

102.    As a result, none of the services for which Defendant clinics submitted bills to Plaintiffs were "lawfully provided" as required by Defendant clinics to seek or obtain reimbursement for these purported services pursuant to the No-Fault Law.

103.    Pursuant to its insurance policies, Plaintiffs are not required to pay any charge that the No-Fault Law does not require it to pay.

104.    Based on the above controversy, Plaintiffs are unsure of its obligation to pay the currently contested and pending charges submitted in excess of $2.1 million and identified in Exhibit "A".

WHEREFORE, Plaintiffs seek a judgment declaring that:

      a.   Plaintiffs are not obligated to pay any of the amounts or charges to Defendant clinics that are outstanding;

      b.   Plaintiffs are not obligated to pay claims or demands that have been or may be submitted by Defendant clinics for services provided at Defendant clinics; and

      c.   Granting such other and further relief this Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rules of Civil Procedure 38(b), State Farm demands trial by jury.

Dated this __10__ day of __May__, 2017.

Respectfully submitted,

JESSICA ZLOTNICK MARTIN, ESQ.
Florida Bar No. 0023014
jmartin@roiglawyers.com
NELSON C. BELLIDO, ESQ.
Florida Bar No. 974048
nbellido@roiglawyers.com
Roig Lawyers
1255 S. Military Trail, Suite 100
Deerfield Beach, FL 33442
Tel: (954) 462-0330
Fax: (954) 462-7798

*Attorneys for Plaintiff State Farm Mutual
Automobile Insurance Company And State Farm
Fire and Casualty Company*